**Attorneys for Plaintiff**
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street
New York, New York 10281
(212) 336-1100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

　　　　　　　　Petitioner,

　　-against-

DAVID RIVARD,

　　　　　　　　Respondent.

15 Civ. ____
ECF CASE

---

### APPLICATION FOR ENFORCEMENT OF COMMISSION ORDER ISSUED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Petitioner Securities and Exchange Commission ("Commission") respectfully brings this proceeding pursuant to Section 21(e)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u(e)(1)] to enforce compliance by the Respondent, David P. Rivard ("Rivard"), with a final Commission order entered on consent against him on October 27, 2004 ("2004 Commission Order"), barring Rivard permanently from appearing or practicing before the Commission as an accountant. Simultaneously, in the action *SEC v. Rivard*, No. 04 Civ. 1464 (E.D.N.Y. Apr. 8, 2004)(ILG) ("2004 Action"), the Commission is moving by order to show cause seeking to hold Rivard in contempt for his refusal to comply with a final judgment on consent entered against him on November 4, 2004 ("2004 Final Judgment") which under the Court's equitable power imposed disgorgement and prejudgment interest, as a well as other relief.

The 2004 Commission Order arises out of the 2004 Action the Commission filed against Rivard on April 8, 2004 charging Rivard with a role in the $1.4 billion securities and accounting fraud at Computer Associates International, Inc. ("Computer Associates"). The Commission alleged that Rivard, as the head of Sales Accounting and the company's revenue recognition expert, had allowed Computer Associates to record revenue prematurely from software contracts, backdated his signature on contracts, and lied to outside counsel and the company's auditor, and obstructed the company's internal investigation and the Commission's investigation. To settle these charges, Rivard consented to the entry of the 2004 Commission Order, as well as the 2004 Final Judgment. However, he has repeatedly violated the Commission's order by regularly appearing and practicing before the Commission as an accountant even though he was suspended from conducting such activity.

Accompanying this petition is the Commission's application for an Order to Show Cause directing Respondent to explain why an order should not be entered against him:(i) enforcing compliance with the 2004 Commission Order; (ii) requiring Rivard to disgorge the compensation he obtained from his violations plus prejudgment interest; and (ii) ordering an asset freeze and accounting. (The same order to show cause also addresses the contempt motion regarding the 2004 Final Judgment). In support, the Commission states:

## INTRODUCTION

1. On October 27, 2004, the Commission entered the 2004 Commission Order, with Rivard's consent, pursuant to Rule 102(e)(3)(i) of its Rules of Practice [17 C.F.R. §201.102(e)(3)(ii)], suspending Rivard from appearing or practicing before the Commission as an accountant. Rivard never sought reinstatement. The suspension remains in effect.

2. From at least April 2009 to April 2014, Rivard violated the 2004 Commission Order by appearing or practicing as an accountant for a public company registered with the Commission.

2

Specifically, in April 2009, Rivard became a financial consultant to Verint Systems, Inc. ("Verint"), a reporting company under the Exchange Act, whose stock is publicly traded on the NASDAQ. Verint engaged Rivard to help the company restate several years of financial statements and cure its then-recurring financial reporting delinquencies. In that capacity, Rivard participated in Verint's financial reporting process by, among other things: editing footnotes to financial statements; compiling data in support of those footnotes; reviewing sales contracts for proper categorization under applicable revenue recognition rules and principles; and preparing internal memoranda on certain accounting processes.

3. In approximately June 2010, after Verint completed its restatements and cured its reporting delinquencies, Rivard began working in Verint's VIS Business Finance Division – one of the company's three global operating divisions. In November 2010, the company converted Rivard to a permanent employee as a divisional Business Finance Manager and he continued to participate in Verint's financial reporting process.

4. Rivard's responsibilities in the VIS Business Finance Division – before and after he became a permanent employee – included: making recommendations about the application of revenue recognition rules to sales contracts involving the company's hardware and software products; reviewing the revenue recognition determinations made by controllers at Verint's German subsidiary respecting sales contracts in Germany; providing revenue recognition guidance to Verint's field offices around the world concerning the proper application of revenue recognition rules and principles to sales contracts; preparing internal memoranda describing the proper treatment of revenue to specific types of contracts; participating in the close process of the division's monthly and quarterly financial accounts; ensuring that his division complied with internal controls over revenue recognition; and communicating with Verint's external auditing firm about revenue recognition-related decisions made within his division.

5. Rivard has disregarded his obligations under the 2004 Commission Order, to which he consented over a decade ago. The Court should therefore enforce Rivard's compliance with the 2004 Commission Order and order disgorgement of the illicit compensation he obtained as a result of his violations plus prejudgment interest.

## JURISDICTION AND VENUE

6. The Commission brings this Application pursuant to Exchange Act Section 21(e)(1) [15 U.S.C. §78u(e)(1)]. The Court has jurisdiction over this Application pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5)], Exchange Act Section 27 [15 U.S.C. §78aa].

7. Venue is proper because certain of the acts, practices, transactions, and courses of business constituting Rivard's alleged violations occurred within the Eastern District of New York. For example, the accounting work for Verint that Rivard performed and which violated the 2004 Commisson Order was on various occasions conducted from Verint's offices in this District. In addition, Rivard resides within this judicial district.

## PARTIES AND RELATED ENTITY

8. Rivard, age 48, lives in East Setauket, New York (Nassau County). Rivard currently works at a recruiting firm. From April 2009 to April 2014, Rivard worked at Verint, first as a financial consultant assisting the company in restating certain financial statements, and then as Business Finance Manager for the VIS Business Finance Division – one of Verint's three global operating divisions. Rivard became licensed as a certified public accountant in February 1992 and surrendered his license to New York State, effective March 2008.

9. Verint is a Delaware corporation headquartered in Melville, New York. Verint makes, sells, and licenses hardware and software products for the security and intelligence business markets. Verint's stock is registered under Exchange Act Section 12(b) and it trades on the NASDAQ Global Select Market.

4

## FACTS

### A. The 2004 Commission Order

10. At Computer Associates, Rivard served as a Vice President and head of the Sales Accounting Department. In this role, Rivard was responsible for, among other things, ensuring contracts involving the sale of the company's software products were recorded in the company's financial records in accordance with applicable revenue recognition principles under Generally Accepted Accounting Principles (GAAP).

11. On April 8, 2004, the Commission filed the complaint in the 2004 Action in this Court alleging that Rivard, who had particular experience in the area of revenue recognition, had allowed Computer Associates to record revenue prematurely from sales contracts. The Commission also alleged that Rivard had backdated his own signature on some of those contracts, knowingly misled Computer Associates' outside auditor by, for instance, hiding fax header dates on some of the backdated contracts, and provided revenue recognition guidance to other Computer Associates employees that furthered the improper accounting practices. (Complaint in 2004 Action at 13-17). As a result of Rivard's and others' conduct, Computer Associates had filed financial statements that improperly recognized $1.4 billion in revenue during fiscal year 2000. (Complaint in 2004 Action at 13-14). The Commission further alleged that Rivard had obstructed its investigation by lying to Computer Associates' outside counsel and conspiring with other company executives to fabricate explanations for documents that potentially showed Computer Associates had engaged in problematic or illegal accounting practices. (Complaint in 2004 Action at 16-17).

12. On October 27, 2004, the Commission issued the 2004 Commission Order suspending Rivard from "appearing or practicing before the Commission as an accountant." The 2004 Commission Order, based on Rivard's offer of settlement, did not contain a provision designating a right to apply for reinstatement after a certain period of time and Rivard has not

5

applied for reinstatement pursuant to Rule of Practice 102(e)(5). The suspension remains in effect.

13. On November 4, 2004, this Court entered the 2004 Final Judgment, on consent, enjoining Rivard from future antifraud and other securities law violations. The court also ordered Rivard to disgorge $65,000 in ill-gotten gains plus prejudgment interest of $18,700.96, and pay a civil penalty of $75,000, totaling $158,700.96. (2004 Final Judgment at 5, Section VI.)

14. In a parallel criminal action, Rivard pleaded guilty to conspiracy to commit securities fraud and agreed to cooperate with the U.S. Attorney's Office for the Eastern District of New York in its prosecution of his former Computer Associates supervisors. *United States v. Rivard*, No. 04 Cr. 329 (E.D.N.Y. Apr. 8, 2004). On January 30, 2007, the Court sentenced Rivard in the criminal action to four months home detention followed by three years supervised release, and community service.

### B. Rivard's Participation in Verint's Financial Reporting Between 2009 and 2010

15. In April 2009, Verint retained Rivard as a financial consultant at $130 per hour to assist the company with its restatement of several years of financial statements, including annual reports on Forms 10-K and quarterly reports on Forms 10-Q. Rivard reported directly to Verint's Senior Vice President of Corporate Finance, Controller, and Chief Accounting Officer.

16. From April 2009 through November 2010, when he became a permanent employee, Verint paid Rivard over $524,477 for his financial consulting services.

17. As a financial consultant, Rivard reviewed the elements of the company's sales contracts to determine if those contracts had been properly categorized under applicable revenue recognition rules. When necessary, Rivard re-categorized the contracts and then an automated system calculated the revenue to be recognized based on Rivard's categorization.

18. Rivard also edited at least two revenue-related footnotes for inclusion in Verint's omnibus restated Form 10-K, covering the periods ending January 31, 2006, 2007, and 2008.

Specifically, Rivard modified eleven versions of Item 8 of Footnote 26 – "Integration, Restructuring, and Other, Net" – between September 14, 2009 and October 16, 2009. The day he stopped modifying Footnote 26, Rivard began work on Item 8 of Footnote 9 – "Short Term Investments," modifying at least six versions of this footnote between October 16, 2009 and November 17, 2009. Rivard provided comments at least once directly to Verint's Vice President of Global Accounting, who incorporated those comments into Footnote 9 on September 16, 2009. And Rivard compiled related supporting documentation for these financial footnotes.

19. Rivard also helped prepare Verint's internal policy memorandum concerning proper identification, disclosure, and recording of related-party transactions under GAAP and Commission rules and regulations. Verint referenced this policy in its restated omnibus Form 10-K, filed on March 16, 2010, and each of its annual Form 10-Ks filed with the Commission thereafter.

20. Verint's Internal Audit Department considered Rivard a "process owner" and required him to sign Sarbanes-Oxley ("SOX") sub-certifications for Verint's annual and quarterly reports filed with the Commission on Forms 10-K and 10-Q, respectively. By signing the sub-certifications, Rivard confirmed that the internal controls within his areas of responsibilities functioned as designed.

21. Rivard was also responsible for reviewing and updating on a quarterly basis, narratives describing the process of revenue recognition and related risks and internal controls within Verint's VIS Business Finance Division.

22. Rivard also communicated with Verint's external auditor and made recommendations to senior financial employees in his division about, for instance, the sufficiency of their documentation supporting particular revenue recognition determinations.

### C. Rivard's Participation in Verint's Financial Reporting Between 2010 and 2014

23. After Verint completed its restatements and cured its filing delinquencies,

Rivard – still a financial consultant – began working within the VIS Business Finance Division, performing tasks related to revenue recognition compliance and the division's quarterly financial reporting process.

24. Rivard was primarily responsible for analyzing whether the divisional order management teams in field offices around the world appropriately applied revenue recognition rules and principles under GAAP to sales contracts. Rivard provided guidance to the order management teams and then advised and made recommendations to his supervisor about proper revenue recognition treatment. Rivard was the first set of eyes in conducting these contract-by-contract reviews.

25. Rivard continued to perform these services after becoming a permanent employee in the division as Business Finance Manager in November 2010. In this capacity, Rivard participated in his division's monthly and quarterly financial reporting. Specifically, Rivard:

   a. reviewed trial balances and general ledger journal entries to confirm that the business units properly recognized revenue from divisional sales contracts and, when necessary, had incorporated his and his supervisor's recommendations during the quarter concerning revenue recognition;

   b. analyzed deferred revenue reports, serving as the "first line of defense" to confirm that the business units properly deferred revenue; and

   c. reconciled trial balances and general ledgers for eight global business units within his division.

26. Rivard advised his supervisor about whether particular revenue recognition determinations would have a material impact on the division's books. He also provided substantive instruction about revenue recognition to accounting staff at divisional field offices. On February 9, 2011, for instance, Rivard told accounting staff in the Asia Pacific field office that they had made an error and needed to reclassify deferred revenue on their books.

8

27. Rivard was also responsible for reviewing revenue recognition determinations made by controllers at Verint's German subsidiary because the sales contracts in Germany required a unique and complex revenue recognition analysis at the end of a quarter.

28. In addition, between 2011 and 2014, Rivard reviewed and updated memoranda setting forth Verint's global accounting policies that summarized the appropriate revenue recognition rules to be applied to specific product lines of Verint. Rivard's work on these memoranda involved, in part, making substantive updates to reflect rule changes pursuant to GAAP. One of the purposes of these memoranda was to assist Verint's external auditor in its audit of Verint's financial statements.

29. For approximately two months after his supervisor left the company in early 2010, Rivard assumed responsibility for reviewing newly signed sales contracts for non-standard language that could have revenue recognition implications. He also helped devise procedures to reduce the amount of time the VIS Business Finance Division took to review manual journal entries in the division's general ledger.

30. In February 2011, Verint transitioned from a manual to an automated process for applying revenue recognition rules to contracts. Rivard was instrumental in helping with that transition as he was responsible for providing the software company with the content for proper application of those rules by the automated system. The automated system did not eliminate the necessity of Rivard's reviews; it merely eliminated the manual application of rules to contracts by the order management teams. After the conversion, therefore, Rivard continued to perform analyses similar to those described above. Rivard knew at the time Verint hired him as a financial consultant, and later when Verint made him a permanent employee, that he would be performing accounting-related services similar to those he performed at Computer Associates.

31. Far from serving as a support-level employee confined to a subordinate role, Rivard and his supervisors, in fact, acted as a team, collectively making revenue recognition decisions for the VIS Business Finance Division.

32. Rivard was also the "point person" for Verint's internal and external audit teams. He assisted the internal audit department with its SOX documentation respecting internal controls by, for instance, reviewing and commenting on the narratives describing the accounting controls his division placed over revenue recognition policies and practices. Rivard signed sub-certifications confirming the same.

33. Rivard handled many of the communications with Verint's external auditing firm about the VIS Business Finance Division's financial results, including about the materiality of particular transactions or events. On April 2, 2012, for instance, Rivard responded in writing to a question from Verint's external auditor about the materiality of time delays between booking a contract and shipping the order that he – along with his direct supervisor and Verint's Global Revenue Recognition Controller – had "concluded" and "agreed" that time delays would be immaterial and provided the reason for that conclusion.

34. Sometimes Rivard provided advice to employees from the auditing firm about substantive accounting issues without involving his supervisor. In one instance, an employee of the auditor told Rivard that she was looking for a way to avoid having to quantify certain revenue "rolling-in" from a prior quarter. Rivard, on his own, responded: "If it helps in your effort to find a way to not have to quantify, the roll-in amount (excluding restatement roll-in) for Q2 is not material compared with Q2's total revenue of $26.5 million, as such non-restatement revenue is no greater than $445k ... ."

35. Rivard also provided reports and documents at the auditor's request, and coordinated compiling documentation supporting the division's decisions.

10

### D. Rivard's Violations of the 2004 Commission Order

36. Rivard practiced as an accountant before the Commission within the meaning of Rule 102(e) and violated the 2004 Commission Order because he participated substantively in the preparation of Verint's financial statements. Among other things, Rivard:

- compiled, edited, and reviewed the accuracy of information and data incorporated into Verint's quarterly and annual reports filed with the Commission, including reports on Forms 10-K and 10-Q, during the restatement process;

- edited footnotes to Verint's financial statements to be included in filings with the Commission;

- prepared a company policy concerning appropriate recording and disclosure under GAAP of related-party transactions, which Verint incorporated into its public filings;

- reviewed, updated, and participated in discussions with Verint executives and the internal and external auditor, about divisional revenue recognition processes and related internal controls;

- made specific recommendations to his supervisors and to accounting departments at Verint's divisional field offices around the world about how revenue from specific contracts should be booked;

- provided revenue recognition guidance to other Verint accounting employees by, for instance, preparing internal memoranda describing the proper treatment of revenue to specific types of contracts;

- participated in his division's monthly and quarterly financial reporting process, including by reviewing deferred revenue reports, serving as the "first line of defense" to determine if the division's books appropriately reflected deferred revenue;

- reviewed and updated memoranda describing Verint's global accounting policy relating to revenue recognition and summarizing revenue recognition policies for specific product lines of Verint, which Verint used to assist its external auditing firm in the audit of the company's internal controls over revenue recognition; and

- reviewed the revenue recognition determinations made by controllers at Verint's German subsidiary because the sales contracts in Germany involved a unique and complex set of accounting rules.

37. The tasks Rivard performed were a necessary part of Verint's financial reporting process, involving substantive recommendations about proper categorization under, and application

11

of, revenue recognition rules to divisional transactions. The revenue recognized by the VIS Business Finance Division necessarily affected Verint's financial statements. Indeed, Rivard performed tasks that could have impacted how Verint recognized the revenue obtained from divisional sales contracts in the company's financial statements. Since Rivard's work could have impacted Verint's financial statements, internal audit classified him a divisional process owner for revenue recognition. Verint also relied on Rivard's expertise to oversee how the company's German subsidiary recognized revenue from software contracts.

38.  In addition, Rivard communicated directly with employees from Verint's external auditing firm about how and why the VIS Business Finance Division recognized revenue as it did. He met with employees of the auditor alone and he provided substantive email responses to their questions about whether particular transactions or time delays would have a material effect on the division's books for purposes of revenue recognition. The company's auditor reviewed all of this information in conducting its annual audit of Verint's financial statements. In other words, Rivard was in a position to advise the auditor about the propriety of his division's revenue recognition determinations, which could impact the auditor's review and opinion of the company's financial statements filed with the Commission.

39.  Rivard's revenue recognition responsibilities as both a consultant and permanent employee involved work that was or might have been reflected in Verint's financial statements. Accordingly, Rivard practiced as an accountant before the Commission within the meaning of Rule 102(e), as defined in Rule 102(f), and as interpreted by Commission and federal district court precedent.

### E. Rivard Obtained Ill-Gotten Gains in the Form of Compensation

40. Between April 2009 and April 2014, Rivard obtained at least $984,477 in compensation from Verint in the form of hourly consulting fees, salary, and non-salary disbursements for his accounting-related work.

## CLAIM FOR RELIEF

41. Section 21(e)(1) of the Exchange Act, 15 U.S.C. § 78u(e)(1), provides:

> Upon application of the Commission the district courts of the United States ... shall have jurisdiction to issue writs of mandamus, injunctions, and orders commanding (1) any person to comply with the provisions of this chapter, the rules, regulations, and orders thereunder, . ...

42. For the reasons set forth in the Commission's Memorandum of Law submitted herewith, these provisions authorize the use of summary proceedings, rather than plenary civil actions, to enforce Commission orders in district courts.

43. The Declaration of Danielle Sallah, dated February 4, 2015 ("Sallah Dec.") with attached exhibits and the Declaration of Alexander M. Vasilescu, dated February 4, 2015 pursuant to Local Civil Rule 6.1(d) are submitted in support of the issuance of an Order to Show Cause.

44. A proposed Order enforcing Rivard's compliance with the 2004 Commission Order and providing additional relief is attached as to the Sallah Dec. as Exhibit 1.

WHEREFORE, the Commission respectfully requests:

I.

That the Court enter an Order to Show Cause directing Rivard to show cause why this Court should not enter an order enforcing his compliance with the Commission Order and granting additional relief.

II.

That the Court thereafter enter an order (1) enforcing the 2004 Commission Order; (2) directing Rivard to comply with the 2004 Commission Order; (3) directing Rivard to disgorge at least $984,477, representing illicit compensation gained as a result of his engaging in work proscribed by the 2004 Commission Order, plus prejudgment interest in the amount of $214,190.11; and (4) ordering an asset freeze and an accounting.

III.

That the Court order such relief as may be necessary for the enforcement of any order of this Court as to disgorgement by civil contempt and/or enforcement through Rule 69(a) of the Federal Rules of Civil Procedure and relevant provisions of the New York Civil Practice Law and Rules.

IV.

That the Court order such relief as may be necessary for enforcement of any order of this Court as to the civil penalty pursuant to the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001 – 3308.

V.

That the Court retain jurisdiction as appropriate to assure and effect compliance with the orders entered herein.

VI.

That the Court grant such other and further relief as may be just and proper.

Dated:   New York, New York
         February 4, 2015         Respectfully submitted,

                                  _____
                                  Andrew M. Calamari
Of Counsel:                       Attorney for Petitioner
                                  SECURITIES AND EXCHANGE COMMISSION
Amelia A. Cottrell                New York Regional Office
Celeste A. Chase                  Brookfield Place, 200 Vesey Street, Room 400
Alexander M. Vasilescu            New York, NY 10281-1022
Danielle Sallah                   Tel.: 212-336-0178 (Vasilescu)
                                  Fax:212-336-1353
                                  E-mail: Vasilescua@sec.gov